**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kenneth R. CHAPMAN, Defendant-Appellant.**

**No. 78–2015.**

United States Court of Appeals, Tenth Circuit.

Argued Nov. 27, 1979.
Decided Feb. 15, 1980.

Richard J. Smith, Asst. U. S. Atty., Albuquerque, N.M. (R. E. Thompson, U. S. Atty. and Robert Bruce Collins, Asst. U. S. Atty., Albuquerque, N.M., on the brief), for plaintiff-appellee.

R. Raymond Twohig, Jr., Asst. Public Defender, Albuquerque, N.M. (William W. Deaton, Federal Public Defender, Albuquerque, N.M., on the brief), for defendant-appellant.

Before SETH, Chief Judge, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Kenneth Chapman (Chapman) appeals his jury conviction of murder with premeditation. Chapman, an Indian, was charged in a one count indictment with unlawfully killing one Larry Paquin (Paquin), an Indian, with malice aforethought, premeditation and deliberation, on the Zuni Indian Reservation, in violation of 18 U.S.C.A. §§ 1153 and 1111. The events preceding the killing are generally not in dispute.

During mid June 1978, Paquin and one Brian Lasiloo were given a ride to a bar by Chapman. After the bar closed the three went to Chapman's trailer, arriving there at approximately 3:00 A.M. At or about sunrise, Paquin obtained the keys to Chapman's pickup, drove Lasiloo to his home and then drove the pickup to Arizona. When Chapman awakened later the same morning and discovered that his pickup was gone, he went to Lasiloo's house seeking his vehicle. Chapman approached Lasiloo with a shotgun, and he became furious when he couldn't find the pickup. Chapman then proceeded to beat Lasiloo with the butt of the gun. Prior to leaving Lasiloo's house, Chapman threatened to kill both Lasiloo and Paquin.

Chapman later reported to the police and others that Paquin had stolen his pickup and that when he found him (Paquin), he was going to "shoot" or "kill" him. Chapman also stated that Paquin had stolen some money from him at the time he took the pickup.

Approximately five weeks later on July 29, 1978, Chapman, who had been drinking, took his pickup [1] and shotgun and went seeking out Paquin in an attempt to "scare him into giving me my money back". Chapman located Paquin about 4:00 P.M. at a friend's house. Witnesses there observed Paquin approach Chapman's truck and talk to him briefly. Moments later, Chapman according to a number of witnesses, "pulled out the gun and fired it", killing Paquin almost instantly. When one of the observers rushed to Paquin's aid, Chapman stated

---

"Come on. You want to be next" and "Remember, forget me or you will be next".

At the time of the shooting, Benito Anastacio was a passenger in Chapman's pickup. Anastacio testified that prior to Chapman's encounter with Paquin he attempted to get out of the truck; that Chapman would not let him; that Chapman stated "You say nothing" and "If I get out of there, I'm going to come and get you". Anastacio also stated that immediately prior to hearing the shotgun blast Chapman told Paquin "I'm going to shoot you" to which Paquin responded, "Go ahead".

Chapman testified that the shooting was an accident. In discussing the shooting, Chapman related:

Q [Mr. Deaton, defense attorney] Were you in your pickup?

A [Kenneth Rudolph Chapman] Yes.

Q Did you have some kind of a gun in that pickup?

A Yes.

Q What did you have?

A A gun, you say?

Q Yes.

A Yes, sir.

Q What kind of a gun?

A It was a sawed off shotgun.

Q What gauge was it?

A Sixteen.

Q And where was it?

A It was under the seat.

Q What happened when you got to the Eriacho's house?

A When I got to the Eriacho house?

Q Yes.

A I called Larry Paquin over to the pickup.

Q How did you do that?

A I went this way to him (indicating). THE COURT: Indicating with his hand. Go ahead.

Q (By Mr. Deaton) And when you did that, did he respond?

A Yes.

Q What did he do?

A He came to the pickup.

Q Now, where was this shotgun at this time?

A It was on my lap.

Q All right, sir, what happened after Larry Paquin came to the pickup?

A Well, he come over there and I asked him if he would return the money that he had taken.

Q What happened then?

A Then he put his hand on the pickup.

Q Yes, sir.

A (Continuing) Well, that is on the mirror, on the side.

Q All right.

A (Continuing) And when I asked him for the money, he said, "I don't owe you a damn thing".

Q What did you say to him?

A Well, I didn't say nothing, he said, "If you're going to use that thing, you can go ahead and use it."

Q And what was he talking about, Mr. Chapman?

A What?

Q What was he talking about?

A The money that he had stolen.

Q When he said, "if you're going to use that thing, go ahead and use it".

A Yes.

Q Was he talking about the gun?

A Yes.

Q Where was it?

A Laying on the window.

Q The truck window?

A Yes, I had my hand over the steering wheel, and it was laying across, this way.

Q Did you have your right hand on it?

A I had it over the top of it (indicating).

Q How were you holding it?

A Well, like it was like this, I had my hand over the top this way (indicating).

Q All right, then what happened?

A Where the hammer was at.

Q Yes, sir, and then what happened?

A Then what he planned on doing was grabbing it, and I pulled it away from him and he pulled it and when he grabbed it and pulled it, he pulled it clear across my hand and the hammer went back and fired.

(R., Vol. III, pp. 223–225).

Chapman testified that after the shooting he panicked, went into shock, and proceeded to his brother's house where he made numerous efforts to call the police, after relating to his sister-in-law that he had accidentally shot a man. In discussing the events immediately prior to the shooting, Chapman stated on cross-examination:

A I would say that I was feeling pretty happy, I was going to the picnic, and I decided to stop there and scare him into giving me my money back.

(R., Vol. III, pp. 242–243).

Chapman also stated that upon seeing Paquin at his friend's house, "I wasn't going to stop until he gave me a finger." (R., Vol. III, p. 242).

Throughout the trial, Chapman repeatedly and consistently denied that he ever told anyone he was going to shoot or kill Paquin.

At the conclusion of all the evidence the jury was instructed on the elements of first and second degree murder. The court declined to give Chapman's proffered instruction on voluntary manslaughter. Following the verdict of guilty, Chapman was sentenced to fifty (50) years imprisonment.

On appeal Chapman contends: (1) the court erred in refusing to give a voluntary manslaughter instruction inasmuch as there was evidence to support such a theory of defense; and (2) repeated comments by the prosecutor gave rise to misconduct and reversible error.

### I.

Chapman contends that the court erred in refusing to give his proffered instruction on voluntary manslaughter. In reviewing the submission of instructions, the following colloquy transpired:

MR. DEATON: May it please the Court, with respect to the Defendant, we would object to the refusal of the Court to give the crime of manslaughter as a lesser included offense and to define the crime of manslaughter; specifically voluntary manslaughter, and manslaughter as was submitted in Defendant's instructions.

(Pursuant to certificate of designation of record on appeal, Defendant proposed instruction on manslaughter furnished to reporter is herewith set forth.)

"Defendant's requested instruction.

"Section 1112 of Title 18 of U.S.C.A. defines manslaughter as follows:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"Voluntary—upon a sudden quarrel or heat of passion.

"The heat of passion, which will reduce a murder to manslaughter, must be such passion as would be aroused naturally in the mind of the ordinary reasonable person under the same or similar circumstances, as shown by the evidence in the case.

"Neither the passion of fear, in and of itself, nor the passion for revenge, in and of itself, nor the passion induced and accompanying or following an intent to commit a felony, in and of itself, nor any combination of any one or more or all of these passions, in and of themselves, constitutes the heat of passion which will reduce a murder to manslaughter. It is true that the emotions just mentioned may be involved in a heat of passion such as substitutes impulse and rashness for judgment; but it is also true that such emotions may exist in the mind of a person who acts deliberately, and from choice, following his own reasoning, however good or bad that reasoning may be.

"The Court does not permit a person to set up his own standard of conduct, or to justify or excuse himself, merely because his passions were aroused, unless the circumstances in which he was confronted, were such as would have aroused the passion of the ordinary rea-

sonable person, similarly situated. So, the test to be applied, in determining whether a killing was in the heat of passion which will reduce a murder to manslaughter, is whether or not, at the time of the killing, the reason of the accused was obscured or disburbed [sic] by passion to such an extent as would cause the ordinary reasonable person to act rationally and without deliberation, and reflection, and from such passion, rather than from judgment.

Devitt and Blackmar, 41.14"

THE COURT: Mr. Deaton, I did not instruct the jury on voluntary manslaughter, because I did not feel that the evidence in this case justified the giving of that instruction. My impression is that as a matter of law, the evidence is sufficient to submit the question of provocation, special provocation to the jury, that is the reason that I didn't so instruct. Any other objection?

(R., Vol. III, pp. 288–290).

Chapman argues that had the requested manslaughter instruction been given, "defense counsel would have been able to argue" from the evidence that the combination of Paquin's "throwing a finger" to Chapman, his remarks that "I don't owe you a damned thing" and "If you're going to use that, use it", when coupled with the background between the men and Chapman's drinking, "could have caused . . [him to] . . . suddenly and impulsively . . . shoot Paquin 'in the heat of passion' ". Chapman argues that with the requested instruction, "argument could well be made that the incident was 'in the heat of passion' notwithstanding the prior statements attributed to . . . [him]."

■ The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge. *United States v. Busic*, 592 F.2d 13 (2nd Cir. 1978). In *Keeble v. United States*, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) the Court wrote of the continued vitality of the lesser included offense doctrine:

Although the lesser included offense doctrine developed at common law to assist the prosecution in cases where the evidence failed to establish some element of the offense originally charged,[5] it is

[5] See *Kelly v. United States*, 125 U.S.App. D.C. 205, 207, 370 F.2d 227, 229 (1966); *United States v. Markis*, 352 F.2d 860, 866 (CA2 1965); 2 C. Wright, Federal Practice and Procedure—Criminal § 515, p. 372 (1969).

now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater. The Federal Rules of Criminal Procedure deal with lesser included offenses, see Rule 31(c),[6] and the defend-

[6] Rule 31(c) provides that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." The rule codified pre-existing law, in particular former § 565 of Tit. 18, Act of June 1, 1872, § 9, 17 Stat. 198. *See Berra v. United States*, 351 U.S. 131, 134 and n. 6, 76 S.Ct. 685, 688, 100 L.Ed. 1013 (1956).

ant's right to such an instruction has been recognized in numerous decisions of this Court. See, e. g., *Sansone v. United States*, 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965); *Berra v. United States*, 351 U.S. 131, 134, 76 S.Ct. 685, 687, 100 L.Ed. 1013 (1956); *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896).[7]

[7] See also, e. g., *Government of Virgin Islands v. Carmona*, 422 F.2d 95, 100 (CA3 1970); *United States v. Comer*, 137 U.S.App. D.C. 214, 218, 421 F.2d 1149, 1153 (1970).

412 U.S. at p. 208, 93 S.Ct. at pp. 1995, 1996.

Numerous courts have considered the availability of the lesser included offense instruction in substantial detail. In *United States v. King*, 567 F.2d 785 (8th Cir. 1977) cert. denied, 435 U.S. 945, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) the court stated:

Next, Cleora King, who was convicted of unlawful narcotics distributions in violation of 21 U.S.C. § 841(a), contends that the District Court erred in refusing her request for an instruction on the lesser-included offense of narcotics possession under 21 U.S.C. § 844(a).[7]

This Court has held that a defendant is entitled to a lesser-included offense instruction when the following five elements are present: (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) there is some evidence that would justify conviction of the lesser offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser-included offense, and (5) there is mutuality, i. e., a charge may be demanded by either the United States or the defense. *United States v. Thompson*, 492 F.2d 359, 362 (8th Cir. 1974).

It does not follow that a lesser included offense instruction is mandatory every time a lesser offense is included within the offense charged in the indictment. The instruction need not be given when "from the evidence adduced at the trial there is no rational basis upon which the jury could find the defendant guilty of the lesser offense." *United States v. Klugman*, 506 F.2d 1378, 1380 (8th Cir. 1974); *see United States v. Rucker*, 496 F.2d 1241, 1243–44 (8th Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 181 (1974).

567 F.2d at p. 790. (Footnote omitted). *See also: United States v. Brown*, 551 F.2d 236 (8th Cir. 1977); *United States v. Crutchfield*, 547 F.2d 496 (9th Cir. 1977).

This Court has consistently held that a defendant is entitled to adequate instructions on his defense, provided there is evidence before the jury reasonably supporting such a theory. *United States v. Pino*, 606 F.2d 908 (10th Cir. 1979); *Devine v. United States*, 403 F.2d 93 (10th Cir. 1968) *cert. denied*, 394 U.S. 1003, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969). In *Pino, supra*, we cited and relied on *Keeble v. United States, supra*, which held that ". . . the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Consistent with these opinions is the underlying predicate that a lesser included instruction is not necessary or appropriate *unless* justified by the evidence and it is not to be used to subject an element of mercy. *United States v. Trujillo*, 497 F.2d 408 (10th Cir. 1974).

■ The availability of lesser included offense instructions is further dependent upon the nature of the crime charged coupled with the testimony of the defendant, if any there be, in presenting his case.

In *United States v. Smith*, 521 F.2d 374 (10th Cir. 1975) we held that the theory of self defense was inconsistent with the crime of involuntary manslaughter; thus, a defendant in a murder case asserting self defense was not entitled to a lesser included instruction of involuntary manslaughter. In *Government of Virgin Islands v. Carmona*, 422 F.2d 95 (3rd Cir. 1970) the court ruled that inasmuch as felony-murder does not necessarily entail a sudden quarrel or heat of passion, voluntary manslaughter was not a necessarily included offense for which instructions were required. *United States v. Wallette*, 580 F.2d 335 (8th Cir. 1978) involved trial on first degree murder charges. The court there held that the refusal of the trial court to instruct on involuntary manslaughter was not error inasmuch as under North Dakota's reckless endangerment statute, the defendant's intentional act of pointing a loaded gun at another with the intent of shooting around the victim and scaring him, constituted a felony.[2]

Courts have also scrutinized the testimony of the defendant in disallowing lesser included offense instructions. In *United States v. Beverly*, 562 F.2d 201 (2nd Cir. 1977) *cert. denied*, 434 U.S. 1039, 98 S.Ct. 779, 54 L.Ed.2d 789 (1978), the court in holding that such an instruction was properly denied, observed:

---

2. Although not presented as an issue on appeal, a similar result would have followed herein in view of New Mexico's statutes.

A defendant is entitled to a lesser included offense charge only if the evidence would permit a jury rationally to find him guilty of the lesser offense but not guilty of the greater. *Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). Here the defendant admitted possession of cocaine; the element in dispute was his intention with respect to the drug. If Beverly's testimony was believed, not only could he not be convicted of either possession with intent to distribute or of distribution, but he also could not be found guilty of simple possession because, as the trial court found as a matter of law, on those facts he would have been entrapped into committing that crime. Therefore, under *Keeble v. United States, supra,* the instruction on the lesser included offense was not to be given since no jury rationally could have found Beverly guilty of committing the crime of simple possession.

562 F.2d at p. 204.

In *United States v. Sinclair,* 144 U.S.App. D.C. 13, 444 F.2d 888 (D.C. Cir. 1971) the court similarly held that the refusal to give a lesser included offense instruction was not error where the defendant's testimony is completely exculpatory and if believed, could only lead to acquittal. The court thus concluded that the kind of reconstruction of events required to support the lesser charge is neither inferable from the testimony nor pointed out by the defendant.

■ Applying these basic principles applicable to the availability of a lesser included instruction, we hold that the trial court properly refused to charge the jury in accordance with Chapman's proffered voluntary manslaughter instruction, since there was no rational basis upon which Chapman could have been convicted of manslaughter. Paramount to our holding are these matters testified to by Chapman without equivocation: that the shooting was an accident; that he was happy at the time of the shooting; that he was going on a picnic; and that he wanted only to scare Paquin. In light of these circumstances, we must reject Chapman's argument that with a lesser included instruction he "would have been able to argue" that the shooting resulted "in the heat of passion". The contention fails to pass judicial muster. A defendant who testifies that a shooting occurred accidentally, that he was "happy" at the time of the shooting and wished only to "scare" the victim, cannot thereafter argue contrariwise, i. e., that the shooting occurred in the "heat of passion".

To accept Chapman's contentions we would have to endorse the proposition that Paquin, by throwing Chapman "the finger", and stating that "I don't owe you a damned thing" and "If you are going to use that, use it", when considered in light of the pickup theft five weeks earlier and Chapman's drinking on the day of the shooting, aroused such anger in Chapman's temperament that he shot in the "heat of passion", and that such passion was the same "as would be aroused naturally in the mind of the ordinary reasonable person under the same or similar circumstances". We cannot rationally, logically, or with any degree of common sense, endorse such a proposition. Accordingly, we hold that the trial court did not err in refusing the proffered instruction.

We observe, without deciding, that had Chapman opted not to testify, thereby removing from the jury's consideration his personal account of events relating to his state of mind, the evidence viewed in the light most favorable to Chapman, vis-a-vis the availability of the instruction, might have warranted the giving of the requested instruction on manslaughter.

## II.

■ Chapman contends that the use of the words "murder", "crime", and "crime scene" by an F.B.I. agent and assistant United States Attorney during the course of direct examination of the agent gave rise to reversible error. We have carefully reviewed the text in which these words were spoken, the objections made relative thereto, and the cautionary instructions of the court. We hold that no error occurred.

■ To be sure, "[W]e have not hesitated in the past to order a new trial when the comments made by the prosecution have been so egregious that they have irreparably prejudiced the defendant". *United States v. Carleo*, 576 F.2d 846 (10th Cir. 1978), *cert. denied* (1978), 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978). However, such is not the case here. Every slight excess of the prosecution does not require that a verdict be overturned and a new trial ordered. *United States v. Coppola*, 526 F.2d 764 (10th Cir. 1975). The comments complained of herein did not rise to the height of plain error. Chapman's constitutional rights were not violated. *United States v. Guerrero*, 517 F.2d 528 (10th Cir. 1975).

WE AFFIRM.

HOLLOWAY, Circuit Judge, concurring in part and dissenting in part:

On this record I am convinced that the jury should have received an instruction on the lesser included offense of voluntary manslaughter. I agree, however, that the claim of misconduct by the prosecutor and the witness does not require reversal.

The Supreme Court has emphatically said that ". . . it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844. And while some courts have said that the decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge, *United States v. Busic*, 592 F.2d 13, 25 (2d Cir.), I cannot agree that the test is one of discretion. If there is some evidence to support a lesser included offense and the defendant requests such a charge, the court has no discretion to refuse the instruction. *United States v. Pino*, 606 F.2d 908, 914 (10th Cir.); 8A *Moore's Federal Practice*, ¶ 31.03. For the trial court in effect to weigh the evidence runs counter to the rule

laid down by the Supreme Court in *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980. Although the circumstances there were much stronger for the defendant, including the fact that both men were armed, the court there stated (*id.* at 314–15, 16 S.Ct. at 839):

The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; *so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence* which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder. . . *The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.* (Emphasis added)

In *United States v. Comer*, 137 U.S.App. D.C. 214, 219, 421 F.2d 1149, 1154 (D.C. Cir.) the court reminded us that "the jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested." Moreover, this court has previously held that a defendant is entitled to instruction on *any* theory of defense finding support in the evidence and the law, and that a refusal of such instructions is reversible error. *United States v. Swallow*, 511 F.2d 514, 523 (10th Cir.), *cert. denied*, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66. Further, the presence of such evidence requires an instruction on a theory of defense "[e]ven though the evidence may be weak, insufficient, inconsistent or of doubtful credibility." *Id.* at 523.

The majority "observe[s], without deciding," that had defendant not testified, especially to his assertion that the shooting was an accident, "the evidence viewed in the light most favorable to Chapman, vis-a-vis the availability of the instruction, might have warranted the giving of the requested instruction on manslaughter." This statement seems to imply that if the defendant relies primarily on the defense that the shooting was accidental, he cannot also rely on an alternative defense that the shooting was at most manslaughter since it occurred in the "heat of passion." Our opinion in *United States v. Smith*, 521 F.2d 374, 377 (10th Cir.), does give support to this statement on inconsistent positions. I am convinced, however, that the controlling principle as recognized by the Supreme Court in *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980, leaves no room for refusing a lesser included offense charge on such a theory in this case. In *Stevenson, id.* at 322–23, 16 S.Ct. at 842–843, the Court reasoned that the evidence there might support both a position of self-defense, showing that no crime at all was committed, and yet also it could support a finding of shooting under the influence of passion and without malice so as to be manslaughter and not murder. The Court referred to examining the testimony of "some of the witnesses", *id.* at 322, 16 S.Ct. at 842, and said that the question was for the jury ". . . *if there be any evidence fairly tending to bear upon the issue of manslaughter . . . .*" *Id.* at 323, 16 S.Ct. at 843. (Emphasis added).

We note that in *Belton v. United States*, 127 U.S.App.D.C. 201, 206, 382 F.2d 150, 155 (D.C. Cir.), it was said that the evidence to support a lesser included offense instruction is sufficient "even though this depends on an inference of a state of facts that is ascertained by believing defendant as to *part of his testimony* and prosecution witnesses on the other points in dispute." (Emphasis added). This principle is more fully stated in *United States v. Huff*, 143 U.S.App.D.C. 163, 168, 442 F.2d 885, 890 (D.C. Cir.):

> The jury is not confined in its findings to matters that are directly set forth in testimony but may base an inference of lesser offense on a "reconstruction that is fairly inferable" from the evidence, gleaned perhaps by putting together some items from one witness, some from another, and some from the jury's own experience and sense of probabilities. . . . And so the judge took into account that the *jury might reasonably make findings different from the version set forth in anyone's testimony.* (Emphasis added)

And as stated in *Stevenson v. United States*, 162 U.S. 313, 322, 16 S.Ct. 839, 842, 40 L.Ed. 980:

> The fact that the evidence might raise an issue as to whether any crime at all was committed is not in the least inconsistent with a claim that it also raised an issue as to whether or not the plaintiff in error was guilty of manslaughter instead of murder.

To the trial judge and to us the evidence to support the lesser offense charge may seem weak and unconvincing. Nevertheless the jury could, I feel, have rejected the defendant's testimony that the shooting was accidental and yet believed and been persuaded by that part of the testimony that the deceased had stolen the pickup and money from the defendant (III R. 218–19), had heckled him on frequent occasions in the meantime about the thefts, had just denied owing him any money, and immediately prior to the shooting had taunted the defendant with both words and gestures (*id.* at 242), while the defendant was in a drunken condition.[1] From these circum-

---

1. It is true that some opinions refer to evaluating the circumstances of the average sober man. *E.g., Hart v. United States*, 76 U.S.App. D.C. 193, 130 F.2d 456 (D.C. Cir.). However, numerous more recent decisions have noted the factor of drunkenness as a part of the total circumstances in deciding whether a manslaughter or lesser included offense was committed as opposed to murder. *E.g., DeMarrias v. United States*, 453 F.2d 211 (8th Cir.); *United States v. Comer*, 137 U.S.App.D.C. 214, 421 F.2d 1149 (D.C. Cir.), and *United States v.*

stances the jury could have drawn an inference that the shooting was done "[u]pon a sudden quarrel or heat of passion," 18 U.S.C. § 1112, although to the court the evidence may have been "overwhelming to show that the killing was in fact murder." *Stevenson*, 162 U.S. at 314, 16 S.Ct. at 839.

Since there was some evidence to warrant a manslaughter conviction, the lesser offense instruction should have been given. On this ground I would reverse.

*Dixon*, 135 U.S.App.D.C. 401, 419 F.2d 288 (D.C. Cir.). In fact, the majority here has commented on the factor of drunkenness, on which there was substantial evidence in this record.